# United States Court of Appeals
## For the First Circuit

No. 05-1305

FREDERICK FEDDERSEN,
Plaintiff, Appellant,

v.

CAROLYN S. GARVEY, ESQ.; and DOUGLAS, LEONARD & GARVEY, P.A.,
Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Restani,* Judge.

Steven M. Latici, with whom McKean, Mattson & Latici, P.A.,
was on brief, for appellant.
Peter F. Kearns, for appellees.

October 26, 2005

_____

*Chief Judge of the United States Court of International
Trade, sitting by designation.

**LIPEZ, Circuit Judge**. Frederick Feddersen brought this malpractice action against the defendants, a lawyer and law firm that represented him during divorce proceedings. The district court granted summary judgment for the defendants on statute of limitations grounds. Feddersen appealed. We affirm.

**I.**

We review the record submitted for summary judgment in the light most favorable to Feddersen. Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 128 (1st Cir. 2004). In 1993, Feddersen, having retained the defendants to represent him, filed for divorce from his then-wife, Shelly Cannon Feddersen ("Cannon"). Although Feddersen and Cannon had entered into a prenuptial agreement before their 1988 marriage, their divorce proceedings were lengthy and complex. Under the terms of the prenuptial agreement, Cannon was entitled to "twenty-five percent of the net book value of FMT corporation" — a closely-held corporation that was Feddersen's principal asset — "calculated as of the end of the fiscal year immediately preceding the filing of the libel for divorce." In the Matter of Feddersen and Feddersen, No. 2001-642, slip op. 1 (N.H. 2003). The parties' efforts to determine the net book value of FMT constituted both a major issue in the divorce and the basis of this case.

During the pendency of the divorce, FMT was prosecuting two patent infringement claims, both related to technology used in

-2-

plastic bottles manufacturing. By 1994, the first claim, against a company known as "Nessei," had resulted in a judgment in favor of FMT for $3.4 million, which had been confirmed on appeal. The second claim, against a company called "Constar," was at an earlier stage of litigation. Feddersen, through the defendants, informed Cannon of the net value of the Nessei settlement and of the existence of the Constar litigation. In December 1994, as discussions on the divorce neared completion, Feddersen offered Cannon the chance to share in any proceeds of the Constar lawsuit in exchange for her contribution to FMT's legal fees in the case. Cannon declined Feddersen's offer and stipulated that she would waive any interest in the Constar case in exchange for a lump sum property settlement. Subsequently, Cannon and Feddersen stipulated to a property settlement of $600,000. Because FMT's assets had been depleted by the two patent litigations, the parties agreed that their stipulation would be filed in escrow with the court until the money from the Nessei case was received, at which time Cannon would be paid and the case would proceed to a final hearing.

By early 1995, the Constar case had been referred to a special master, who, in February 1995, found in favor of FMT and recommended a judgment of $30 million. Feddersen and counsel for FMT expected a lengthy and costly appeal, but Constar settled for $11 million in April 1995. FMT received its first payment of $5

million from Constar in May 1995, well before any payment was received from Nessei.[1]

Neither Feddersen nor the defendants informed Cannon or her lawyers of the developments in the Constar case. Instead, on June 1, 1995, the defendants sent the New Hampshire court and Cannon's lawyers a letter stating that the awaited "contingency," meaning the receipt of funds sufficient to satisfy the property settlement in the divorce stipulation, had occurred. Cannon and her lawyers assumed that the money from Nessei had been delivered.

For a final hearing, the defendants prepared for Feddersen an affidavit of his current financial standing, which was submitted to the court in accordance with former New Hampshire Superior Court Rule 158.[2] In the affidavit, Feddersen certified that the value of his interest in FMT corporation was "[$]1,440,000 [b]ased on book value 12/31/92," and that his income was $150,000 per year. A final divorce decree, incorporating the $600,000 property settlement, entered on July 13, 1995.

In late 1998, Cannon petitioned for additional child support payments from Feddersen. Trial was scheduled for March

_____

[1] Payment from Nessei did not arrive until January 1996. The record does not indicate the reasons for the delay.

[2] At the time of the proceedings, New Hampshire Superior Court Rule 158, which was repealed in 2001, provided, in pertinent part, that the parties to a divorce submit current financial affidavits. See N.H. Superior Court Rules 197-98 (2001) (current version of the same rule).

1999, and discovery commenced. In reviewing Feddersen's tax returns, Cannon's lawyer, Patricia Murphy, learned that Feddersen's income for 1995 had been nearly $4 million, not the $150,000 he had sworn to in the affidavit prepared by the defendants. Murphy and Cannon soon learned about the Constar settlement. By this time, Feddersen had retained a new lawyer, Steven Grill. Murphy told Grill that she was thinking about moving to set aside the 1995 property settlement on the grounds of fraud.[3]

Grill explored Murphy's theory and determined that Feddersen had "a problem" because of the discrepancy between his financial affidavit and his actual income and assets. He told Feddersen as much in a March 26, 1999 letter and status report, going so far as to warn his client that if Cannon "pursues a fraud claim, you may be very hard pressed to prove that she actually had all the details regarding the Constar case at the time the Permanent Stipulation was negotiated and agreed to," and that "there is a strong possibility that the Affidavit would not be considered a 'current' affidavit as required by New Hampshire law."

---

[3] Cannon's lawyer relied on Shafmaster v. Shafmaster, 642 A.2d 1361 (N.H. 1994). The Shafmaster court concluded that in a divorce case, "once financial information was requested and provided, the defendant had an ongoing obligation to provide current and accurate financial information." Id. at 1365. New Hampshire Superior Court Rule 158, the Shafmaster court concluded, incorporates this continuing obligation. Id. at 1366. The Shafmaster decision included a warning that the provisions of Rule 158 would be deemed "mandatory and may not be waived by parties or the court." Id. The Shafmaster decision was announced more than a year before the defendants submitted Feddersen's Rule 158 affidavit.

Grill "strongly recommend[ed]" to Feddersen that he try to settle Cannon's claims and avoid litigation of "a complicated and potentially very dangerous issue."

In the same letter, Grill reacted angrily to news that Feddersen had put Charles Douglas of the defendant law firm on notice of Cannon's potential fraud claim. "My main concern," Grill wrote, "is that having been alerted to the potential problem . . . Douglas may attempt to protect himself against any potential malpractice claim."

Shortly after receiving the March 26 letter, Feddersen terminated his relationship with Grill (who later noted that he and Feddersen had not been "seeing eye-to-eye on a number of strategic and judgmental matters"). Feddersen retained, as new counsel, Matthew Cairns and Garry Lane. Feddersen's initial April 14, 1999 meeting with Cairns and Lane was recorded at Feddersen's request. At that meeting, Feddersen revealed to Cairns and Lane that he had called Carolyn Garvey, a named defendant in this case along with Douglas and their law firm. According to Feddersen, Garvey had denied that anything about the 1995 settlement was improper. Feddersen also told Cairns and Lane that, according to Grill, Garvey and her partners would "be fixing all the documents up now to cover their ass for malpractice."

Citing the Shafmaster case, see supra n.3, Cannon moved, on May 14, 1999, to set aside the 1995 property settlement. At the

recommendation of the marital master handling the case, settlement negotiations commenced. Through Cairns and Lane, Feddersen sought to resolve Cannon's claims by offering her a substantial share in the potential proceeds of a third patent infringement case, then ongoing, with a company called "Aoki." Ultimately, negotiations were unsuccessful, and the matter proceeded to a hearing. On September 5, 2001, the marital master set aside the property settlement. His decision was affirmed by the New Hampshire Supreme Court on March 19, 2003. In the Matter of Feddersen and Feddersen, No. 2001-642 (N.H. 2003). Feddersen then paid $1.3 million to settle all remaining issues with Cannon.

Invoking 28 U.S.C. § 1332, Feddersen filed the current suit in the district court on July 29, 2003. The defendants moved for summary judgment on the grounds that Feddersen had exceeded the three year statute of limitations for legal malpractice actions provided by N.H. Rev. Stat. Ann. § 508:4.[4] The district court granted the defendants' motion, and this appeal followed.

## II.

We review a grant of summary judgment de novo, based on the record as it stood at the time of the district court's order. Cordero-Soto v. Island Fin., Inc., 418 F.3d 114, 118 (1st Cir. 2005). We will affirm summary judgment if the record shows "that

---

[4] The defendants' earlier motion to dismiss on the same grounds was denied.

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). A "material" fact is one "that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## A. The Discovery Rule

In this diversity action the governing law is, of course, the law of New Hampshire. Rodi v. Southern New England School of Law, 389 F.3d 5, 13 (1st Cir. 2004). New Hampshire law provides that "the statute of limitations for a malpractice action is three years." Furbush v. McKittrick, 821 A.2d 1126, 1129 (N.H. 2003) (applying discovery rule to legal malpractice case); N.H. R.S.A. § 508:4. When a suit is initiated more than three years after the act or omission alleged to constitute malpractice, "the plaintiff has the burden of proving that an exception applies to toll the statute of limitations such that his malpractice claim would be timely filed." Furbush, 821 A.2d at 1129. One such exception is the discovery rule:

> when the injury and its causal relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission, the action shall be commenced within 3 years of the time the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the injury and its causal relationship to the act or omission complained of.

-8-

N.H. R.S.A. § 508:4. Feddersen contends that the discovery rule tolled the statute of limitations until at least the date that the marital master set aside the property settlement. The defendants argue, and the district court concluded, that the discovery rule tolled the statute of limitations only until the spring or summer of 1999, by which time Feddersen knew that Cannon had initiated proceedings to set aside the property settlement and that the acts or omissions of the defendant were causing him harm.

Under New Hampshire law, the discovery rule operates to toll the statute of limitations in a legal malpractice case only until "the plaintiff could reasonably discern that he suffered some harm caused by the defendant's conduct." Furbush, 821 A.2d at 1130. It does not matter that "the plaintiff may not have understood the full extent of the harm that would result" from the defendant's malpractice. Id. "[T]he discovery rule is not intended to toll the statute of limitations until the full extent of the plaintiff's injury has manifested itself." Id. Also, the plaintiff does not have to know that the defendant actually was negligent. The New Hampshire Supreme Court has held that a plaintiff can "reasonably discern that he suffered some harm caused by the defendant's conduct," id., for the purpose of the discovery rule, as soon as he begins "incurring legal fees" to defend himself against the consequences of a defendant's actions, Pichowicz v. Watson Ins. Agency, Inc., 768 A.2d 1048, 1049 (N.H. 2001). The

discovery rule, then, does not necessarily allow a plaintiff to postpone a malpractice suit until a court has confirmed the defendant's negligence.

As the district court recognized, Feddersen knew enough by the summer of 1999 that he "could reasonably discern that he suffered some harm caused by the defendant's conduct." Furbush, 821 A.2d at 1130. By that time, Feddersen had paid legal fees to two additional law firms in order to begin defending himself against the consequences of what he now alleges was the defendants' malpractice. Feddersen had been told in no uncertain terms by one of his lawyers that "he had a serious problem because of the Shafmaster issue arising from the affidavit prepared by [the defendants]." That same lawyer had told Feddersen, both orally and in writing, that he had a "potential malpractice claim" against the defendants. With all of this information at his disposal, Feddersen could not reasonably have doubted that his additional legal fees and prospective settlement expenses had been caused by the defendants' representation of him. At this point, Feddersen was not entitled to close his eyes and ignore his potential claim against the defendants.

Feddersen contends that, given the defendants' assurances that they had done nothing wrong, it was "reasonable" for him to believe that his legal expenses were caused "by a very motivated ex-wife" rather than by the defendants' malpractice, until a court

ruled in Cannon's favor. This argument reflects both misapprehension of the applicable standard and disingenuousness.

It is not material for purposes of the discovery rule whether Feddersen knew or reasonably should have known in 1999 that the 1995 property settlement would be set aside on account of the defendants' failure to comply with the law, or that the defendants had been negligent. It was enough that Feddersen knew that he was paying attorneys' fees (to a different lawyer) to defend acts of the defendants that had been at least arguably negligent, and that there was a likelihood — expressed in Feddersen's willingness to settle the case for a substantial sum — that eventually he would have to pay monetary damages to Cannon as well.[5]

Feddersen was a sophisticated businessman who had won substantial awards in lawsuits. His own lawyer explicitly warned him not to trust the defendants' assurances because the defendants could be expected — using Feddersen's own 1999 words — to "cover their ass for malpractice." He understood that his exposure to Cannon's claim was serious enough to warrant a significant offer in

---

[5] For similar reasons, we are not swayed by Feddersen's reliance on the defendants' delay in reporting Feddersen's malpractice claim to their insurance company. (The defendants did not notify their insurer until 2003.) This evidence does not tend to show that Feddersen's own delay was reasonable. Very likely, the defendants expected Feddersen to file a suit against them before he did. But even the most generous inference in favor of Feddersen from evidence that the defendants did not report such a suit to their insurance carrier until 2003 cannot undue the uncontested evidence as to what Feddersen actually knew in 1999.

settlement. In short, the evidence does not allow an inference that Feddersen "reasonably relied" on the defendants' denials of any negligence.

**B. Continuing Representation**

Feddersen contends that the "continuing representation doctrine" precluded application of the discovery rule until 2001. In jurisdictions where it applies, that doctrine, which "recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith," Greene v. Greene, 436 N.E.2d 496, 500 (N.Y. 1982), "tolls the statute of limitations 'while the defendant attorney [in a malpractice case] continues to represent the plaintiff," Rosen Const. Ventures, Inc. v. Mintz, Levin, Cohn, Ferris Glovsky & Popeo, P.C., 364 F.3d 399, 406 (1st Cir. 2004) (quoting Cantu v. St. Paul Cos., 514 N.E. 2d 666, 669 (Mass. 1987)).

First, Feddersen's continuing representation argument fails because New Hampshire has not adopted the doctrine. In another case involving a legal malpractice plaintiff who was forced to retain counsel to defend himself from the consequences of a defendant attorney's likely malpractice, the New Hampshire Supreme Court specifically "decline[d] to adopt" the continuing representation rule. Coyle v. Battles, 782 A.2d 902, 906 (N.H. 2001). This case is in federal court on diversity grounds. While Feddersen no doubt had good reasons to initiate his suit in federal

court, he cannot expect us to adopt a new rule of state law that the state's highest court refused to adopt only four years ago, in a case similar to this one. "We have warned, time and again, that litigants who reject a state forum in order to bring suit in federal court under diversity jurisdiction cannot expect that new trails will be blazed." Ryan v. Royal Ins. Co. of Am., 916 F.2d 731, 744 (1st Cir. 1990).

Second, even if we applied the continuing representation doctrine (as it is defined in the Massachusetts cases to which Feddersen refers us), we would not resolve this appeal in Feddersen's favor. "The continuing representation doctrine . . . has no application . . . where the client actually knows that he suffered appreciable harm as a result of his attorney's conduct. If the client has such knowledge, then there is no 'innocent reliance which the continued representation doctrine seeks to protect.'" Lyons v. Nutt, 763 N.E.2d 1065, 1070 (Mass. 2002) (quoting Cantu, 514 N.E.2d at 669). Here, as noted, Feddersen knew that he had been harmed by the defendants; he did not rely "innocently" on their assurances to the contrary.

## C. Inconsistent Positions in Litigation

Feddersen argues that the district court's ruling "placed [him] in the untenable position of having to file a malpractice action against his former attorney [at a time when doing so would have] compromise[d] his ability to defend the underlying case"

brought by Cannon.  There are cases in other jurisdictions that support this argument.  See Clark v. Deloitte & Touche LLP, 34 P.3d 209, 217-18 (Utah 2001) (allowing tolling of malpractice action against accountant until conclusion of underlying litigation); Hughes v. Mahaney & Higgins, 821 S.W.2d 154, 157 (Tex. 1991) (same).  There are also cases that reject it.  See Carvell v. Bottoms, 900 S.W.2d 23, 29-30 (Tenn. 1995) and cases cited therein.

We view Feddersen's contention as again foreclosed by the New Hampshire authorities.  In at least two cases, the New Hampshire Supreme Court has refused to toll the statute of limitations in a professional liability action while the plaintiff-client sought to defend the professional's advice in collateral litigation.  In Draper v. Brennan, 713 A.2d 373 (N.H. 1998), the New Hampshire Supreme Court rejected the reasoning in Hughes and the proposition that a plaintiff should be able to postpone a legal malpractice action until the conclusion of an appeal in the underlying litigation.  Id. at 377-78.  In Pichowicz, the New Hampshire Supreme Court refused to toll the statute of limitations in a professional malpractice suit (against an insurance agent) until the conclusion of trial on the underlying claim.  768 A.2d at 1049.  To the extent that Feddersen seeks to limit or challenge these holdings, he has chosen the wrong forum.

Moreover, we do not think that Feddersen would have been injured by commencing his malpractice action while Cannon's suit

-14-

against him was pending.  If Feddersen had brought suit against the defendants in 1999, he could have asked the district court to hold the action in repose until the conclusion of the Cannon case. We think it likely that the court would have granted the motion. See Currie v. Group Ins. Comm'n, 290 F.3d 1, 9-13 (1st Cir. 2002) (discussing doctrines pursuant to which federal courts may stay cases pending outcome of related state court litigation raising complex issue of state law).  See also Morrison v. Goff, 91 P.3d 1050, 1055-58 (Colo. 2004) (collecting cases and adopting "two-track" approach, by which malpractice action is filed during pendency of underlying litigation and then stayed until resolution of the underlying case).  We also think it likely that Feddersen could have resisted any effort by Cannon to use the existence of a malpractice suit against him in her underlying case.  Feddersen has not suggested how evidence of the malpractice suit could have been introduced at trial on Cannon's claim, nor why the judge hearing the matter would have held any such evidence against him.  See Carvell, 900 S.W.2d at 30 (holding that judicial estoppel doctrine did not apply when malpractice action was filed during pendency of related litigation).

## III.

The judgment of the district court is **affirmed**.  Costs are taxed against the Appellant.

So ordered.